UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
RICARDO GRANDERSON

                        Plaintiff,

    -against-

THE LEGAL AID SOCIETY, SEYMOUR
JAMES, TAMARA STECKLER, ALLAN
FOX, AIDA RAMOS, JUSTINE LUONGO,
BERNETTE CARWAY-SPRUIELLE,
ALLAN FOX, SCOTT ROSENBERG,
BHARATI NARUMANCHI, LEGAL AID
SOCIETY UNION, ALL DEFENDANTS
ARE NAMED INDIVIDUALLY
AND IN THEIR OFFICIAL CAPACITIES.

                      Defendants
-------------------------------------------------------X

**VERIFIED COMPLAINT
AND JURY DEMAND**

Docket No.:

      Plaintiff, Ricardo Granderson, by his attorneys, Emdin & Russell, complaining

of defendants, The Legal Aid Society ("LAS"), Seymour James, Tamara Steckler, Allan

Fox, Aida Ramos, Justine Luongo, Bernette Carway-Spruiell, Allan Fox and Scott

Rosenberg alleges upon information and belief:

1.     This is an action to remedy (a) race discrimination via hostile work environment,

(b) harassment, (c) denial of reasonable accommodation, (d) retaliation for filing EEOC

Charge, (e) defamation, (f) intentional infliction of emotional distress, (g) wrongful

termination all of the foregoing in violation of Title VII of the Civil rights Act of 1964

("Title VII") 42 U.S.C section 2000e, etc. seq.

## JURISDICTIONAL BACKGROUND

2.      Plaintiff, Ricardo Granderson ("Plaintiff and/Mr. Granderson"), is an African-American individual, at all times herein, residing in Brooklyn, New York.

3.      Plaintiff is a "person" within the meaning of 42 U.S.C. section 2000e(a).

4.      Plaintiff is an "employee" within the meaning of 42 U.S.C. section 2000e(f).

5.      Defendants, The Legal Aid Society, is a domestic non-profit corporation doing Business in the State of New York, with its corporate headquarters located at 199 Water Street, New York, New York, 10038. Seymour James is the Attorney-in-Chief, Tamara Steckler is the head of the Juvenile Rights Practice, Allan Fox is the Chief Human Resources Officer, Aida Ramos is the Criminal Defense Practice's Practice Administrator, Justine Luongo is the head of the Criminal Defense Practice, Scott Rosenberg is the General Counsel, Bernette Carway-Spruiell is the Recruitment Administrator.

6.      Defendant  is an "employer" within the meaning of 42 U.S.C. section 2000e (b) because it has more than fifteen (15) persons in its employ in the City of New York.

7.      The Plaintiff has been employed by The Legal Aid Society since on or about November 10, 2011 and continues to be employed as of the filing of this complaint.

8.      The conduct complained of occurred within the boundaries of New York City, New York County.

9.      This Court has jurisdiction over claims arising under 42 U.S.C. section 2000e, et. seq.

2

## FACTS

10.     Plaintiff is an African-American male and has been employed by The Legal Aid Society since on or about November 9, 2011 as the Director of Legal recruiting and Diversity Officer ("Director").  When he interviewed for the job, he was told that there was "no budget and no staff."  The Plaintiff is a graduate of Wesleyan University, CUNY Law School and did additional training in Mediation at Columbia University Law School and at the Cornell School of Labor Relations.  He has had articles published in The Amsterdam News, the International Institute for Conflict Prevention and Resolution's ("CPR")Alternatives to Litigation magazine and Law 360 Magazine.  He was on the CPR's national Diversity Task Force and has been a board member at several New York City non-profits.  He has also been a featured speaker at webinars and seminars on workplace issues.  He was a candidate for the President's role at the National Association of Law Placement Professionals and was recognized for his commitment to youth in Harlem by Achieving Leadership's Purpose which is a 40 year old leadership training program.  The Plaintiff has received laudation from the law schools deans and administrators, law students, the former Legal Aid Attorney-in-Chief and the President of the Legal Aid Society board.

11.     The Director of Legal Recruitment and Diversity Officer is a member of Senior Management at The Legal Aid Society.  The essential components of the job, as described in the Legal Aid posting, were "The Legal Aid Society is seeking an individual whose primary focus will be to ensure that workforce diversity is an integral part of the organization's programs, operations and decision process.  The individual will be responsible for developing and implementing recruitment, hiring, retention and training

3

initiatives and business practices to build and maintain a diverse workforce. This position is also responsible for maintaining and administering the Society's Anti-Discrimination Policy, including the investigation and handling of complaints of discrimination or harassment in coordination with the senior management of the Society." This was a reposting of this position to encourage the broadest possible applicant pool. The Plaintiff drafted and created a Legal Recruitment & Diversity Manual in his first month at Legal Aid. This task was not requested, but was the Plaintiff's creation of a tool that LAS did not have. This was an indication of the Plaintiff's professionalism and initiative such that Legal Aid should have been aware that the Plaintiff could work and lead independently as a professional.

12.     The Plaintiff never performed any of those functions described in paragraph 11 and never investigated any complaints, was never involved in the monitoring of EEO compliance despite 11 years of relevant experience. The Plaintiff was directed to do data entry and other clerical and administrative tasks solely. The Plaintiff was part of a committee and made recommendations regarding the complaint process, the manner of investigations conducted by HR staff, outside counsel and the drafting of the complaint reports, but those recommendations were ignored.

13.     During the Plaintiff's tenure at Legal Aid, he created a Legal Recruitment & Diversity Manual in the first 3 weeks, the Legal Aid Society was recognized as a Diversity Champion, received the highest ratings on the Human Rights Corporate Equality Index Benchmarking tool, "CEI", (100% for three consecutive years.) That standard put Legal Aid on par with the biggest law firms with respect to ratings. The Plaintiff researched the benchmarking tool without any direction or suggestion because

Allan Fox had said on the Plaintiff's first day that he wanted "Legal Aid to be the Best in Class." The Plaintiff took those words as a mandate and plotted the course to Best in Class status. The next step, after the CEI, was to have been participation in the Best Non-Profit Companies to Work For. The Plaintiff presented the Seymour James, Justine Luongo, Tamara Steckler, Adrienne Holder, Allan Fox, Scott Rosenberg the materials.

14.     The Legal Aid Society leadership never responded to emails about the 2014 Best Not-for-Profits to work For despite the fact that important diversity information would have been captured at no cost as opposed to the two hundred sixty seven thousand ($267,000.00) dollars that Legal Aid's leadership decided to pay a Diversity consultant to conduct training that the Plaintiff had previously done pursuant to a Consent Decree for a 10,000 employee organization. Instead of having the Diversity Officer/Plaintiff as the lead or point person on the Diversity Consultant search, the General Counsel was the lead and the Diversity Officer was not directly consulting to draw upon his expertise prior to the project.

15.     When the Plaintiff showed up for work o the first day, he was informed by Allan Fox that Jennifer Lewis and Monique Vorms (a temporary employee) were his staff. Ms. Lewis was to be the Plaintiff's Deputy or Assistant Director of Legal Recruitment.

16.     On or about November 11, the Plaintiff visited the NYC law schools and the schools described Legal Aid's Recruitment efforts as "dreadful", "a black hole where information goes in and nothing comes back.", "lacking transparency", "that no one ever responds to calls or emails." The schools also inquired about LAS' Fellowship process. When the Plaintiff returned to the office and asked Mr. Fox about the Fellowship process,

he replied "Oh yeah, you're the head of the Committee." Mr. Fox should have shared

that information prior to the Plaintiff's meeting with the law schools.

17.    On or about November 16, 2011, the Plaintiff scheduled a meeting on the Outlook

calendar and booked a specific conference room. Tamara Steckler sent the Plaintiff an

email and copied Scott Rosenberg on the email. Ms. Steckler's email instructed the

Plaintiff that he was "wrong about the conference room and that there was no such

room." The Plaintiff, who is s competent reader, looked again and the conference room

was correct. Ms. Steckler eventually sent an email indicating that she was incorrect.

Scott Rosenberg went to the Plaintiff's office and told him that he was "wrong" about the

conference room. The Plaintiff then turned his monitor to facilitate viewing by Mr.

Rosenberg and then, seeing the inaccuracy of his conclusion and Ms. Steckler's email,

relented.   Somehow, Mr. Rosenberg did not believe that the Black male Plaintiff was

literate and could read numbers of a conference room.

18.    According to Ms. Lewis, Allan Fox had previously given her a fifteen thousand

dollar ($15,000.00) raise. Upon information, belief Ms. Lewis brokered a relationship

with the Temporary Agency and negotiated a preferred rate of pay for Monique Vorms

(her friend) that Allan Fox approved. This was an indication of the special relationship

that existed between Ms. Lewis and Mr. Fox as Legal Aid employees; particularly

support staff do not get raises. More importantly, it was that relationship between Fox

and Lewis that would be the basis for the orchestrated insubordination and malicious and

defamatory harassment complaints that Mr. Fox directed Ms. Lewis and Ms. Vorms to

file against the Plaintiff in his first month at Legal Aid. It should be noted that Ms.

Lewis, after receiving a $15,000.00 raise then asked the Plaintiff within the first 2 weeks for a raise but never disclosed that she had received such.

19.    On or about November 11, 2011, Allan Fox informed the Plaintiff, in response to the question 'How did you get involved in HR work?', that he "used to sell jewelry for Fortunoff" and that he did not "want to do it any more" and that the "owner of the business" asked him whether he wanted to be the "head of Human Resources." Fox told the plaintiff that his next job was at "Loews" then a contact resulted in his job at The Legal Aid Society. Most CHRO have degrees in HR, training in labor relations, many are trained lawyers, training in employment law, etc. Mr. Fox had none. He sold jewelry and was a musician, yet he was hired by Legal Aid to be the CHRO. This illustrates that Mr. Fox lacked the requisite training and experience befitting a Chief Human Resources Officer which was a prima facie indication that he was unqualified to supervise the Plaintiff. This lack of qualification and personal racial animus prompted his efforts to undermine the Plaintiff and to orchestrate a hostile work environment that would compel most reasonable and prudent people to resign under the pressure.

20.    On or about November 13, 2011, the Plaintiff and Allan Fox met with Deborah Wright and Bharati Narumanchi who were the representatives of the lawyers' union. The Plaintiff purchased two bottles of Poland Spring water and gave them to both of the Union representatives. This was done because; in the Plaintiff's previous professional life coffee and water were offered as a matter of course.

21.    On or about the end of November and the beginning of December the Criminal Defense Hiring committee requested a meeting with the Plaintiff alone. Seymour James decided that he should attend the meeting as well. There was a pre-meeting to prepare

for the meeting. After the meeting concluded, the Plaintiff went back to his office and was working on related matters. Seymour James came into the Plaintiff's office, engaged in pleasantries, and then conveyed that he wished to talk about the "deliverables." This was completely proper and was to be expected. Mr. James then began to dictate, seriatim, a series of items. Because the Plaintiff was working and in the middle of working and typing, he asked Mr. James if he could send him "an email, like Scott and Steve." Mr. James yelled "YOU SEND ME AN EMAIL!!!" He eventually left the office. That same evening, the Plaintiff went to Mr. James' office and said, inter alia, "Listen, I don't want any trouble." Mr. James' behavior was an indication that he perceived the Plaintiff, a member of Senior Staff as support staff. Support staff at Legal Aid are treated differently from Senior Staff and lawyers in that they are regularly berated, insulted, etc. Mr. James' behavior was an indication that he had colluded with Mr. Fox to pressure and insult the Plaintiff with hopes that he was resign under the pressure.

22.    On or about the beginning of November 2011, the Plaintiff attended a meeting with Allan Fox, Jennifer Lewis and Monique Vorms and the Plaintiff observed that Mr. Fox, the Chief Human Resources Officer, was instructing Lewis and Vorms to make decisions about the ethnicity of applicants by "how their names sounded." This instruction was not standard in either the Human Resources or Diversity portfolios. In fact, it was antithetical to Diversity and HR Best practices and was potentially a liability for Legal Aid vis-à-vis self identification of applicants. The Plaintiff suggested that LAS defer to self identification and Mr. Fox and Legal Aid ignored the suggestion and the practice continued. This was part of a regular pattern of Legal Aid ignoring best practice

recommendations from the Plaintiff with the objective of undermining the Plaintiff and creating a hostile work environment such that the Plaintiff would resign.

23.     Within the first two weeks, the Plaintiff observed that neither Ms. Vorms nor Ms. Lewis were responsive when asked to perform basic tasks.  The Plaintiff pointed this out to Mr. Fox and he, despite having the special relationships with Ms. Vorms and Ms. Lewis did nothing thereby stoking, contributing and encouraging insubordination and a hostile work environment.

24.     On or about November 17, 2011, the Plaintiff walked into Ms. Lewis' office and noticed that there was a 4 ½ 'pile of paper on a desk.  When the plaintiff asked Ms. Lewis what it was her answer was "I don't know."  This was an indication that Ms. Lewis had not been doing her job, under Mr. Fox's direct supervision, for years as the pile contained 3 ½ years of resumes, cover letters and writing samples.  Moreover, the law schools had informed the Plaintiff that they believed that "resumes and cover letters were being lost and that Legal Aid never returned phone calls or respond to emails when applicants contacted them."  This was an indication of the public relations disaster that Legal Aid and Allan Fox, as the CHRO, had created and was aware of that the Plaintiff was tasked to address.  In fact, Mr. Fox referred to the Plaintiff's job via metaphor, "fixing the ship while sailing the ship at the same time."

25.     The Plaintiff, after discovering the pile, then provided clear and detailed communication notes on each of the resumes that he hand-delivered to Ms. Lewis.  The expectation was that Ms. Lewis would send the communications.  She did not and Allan Fox did not support the Plaintiff and allowed Ms. Lewis to do nothing and to be

insubordinate in his efforts to create a hostile work environment that would compel the Plaintiff to resign.

26.     The Plaintiff observed that Ms. Lewis would regularly not respond to emails or phone calls. This was conveyed to Allan Fox and he did not intern or suggest to Ms. Lewis that it was a standard part of the workplace for subordinates to comply with reasonable, lawful and required work related tasks. Mr. Fox did nothing and supported and encouraged Ms. Lewis' behavior.

27.     The Plaintiff almost resigned from his job as the Director within the first three Weeks of joining The Legal Aid Society and informed the former Attorney-in-Chief who suggested that he not retire. The Plaintiff also had a conversation with Adrienne Holder on a Saturday about his experiences. Ms. Holder and the Plaintiff had a mutual friend and he reasonably believed that she could be an ally. Because the Plaintiff perceived that he was not welcomed and not treated as a member of Senior Staff, he sought out allies for emotional support and believed that Ms. Holder could be such, but she was not. The Plaintiff was alone and the only support came from Steve Banks, the former Attorney-in-Chief.

28.     On or about November 17, 2011 Allan Fox told the plaintiff that "there are people here who don't want you to succeed." This was completely unsolicited. This was an indication that Mr. Fox and others in Senior Management would be engaging in behaviors to cajole the Plaintiff's resignation through the use of orchestrated intentional behavior that was designed and, in fact, resulted in emotional distress of the Plaintiff.

29.     On or about November 25, 2011, Scott Rosenberg, the General Counsel went into the Plaintiff's office and "apologized" for the "lack of onboarding" by Allan. He

specifically said that "Allan was sorry." This was an indication that Scott Rosenberg and Allan Fox, whose offices are next door to each other, were friends and that Mr. Rosenberg was an active surrogate and participant in Mr. Fox's creation of the hostile work environment.

30.     In November, the Plaintiff was having a conversation with Ms. Fox (in the Plaintiff's office) and Mr. Fox was discussing an employee who had previously worked in Recruitment. The employee was named Khadijah Muhammad. According to Mr. Fox, Ms. Muhammad was "fired because she had been stealing money." According to Mr. Fox "Legal Aid doesn't fire anyone." He would eventually express a desire to "fire" an employee named Tony Romano. According to Tina Kemp-Bland (the former Deputy Director of HR), "Khadijah never stole any money. That's a lie!" Mr. Fox's equivocations were an indication of his character of duplicity such that he is the kind of person, with the support of Legal Aid's Practice heads, would orchestrate a hostile work environment because he had personal and racial animus toward the Plaintiff.

31.     On or about November 30, 2011, the Plaintiff noticed that there was a difference between the name of the applicant on an offer letter and that which was on the spreadsheet. The Plaintiff pointed it out to Jennifer Lewis and she never responded or addressed the issue. Ms. Lewis once, as an explanation for not performing tasks, asserted that she was "working on Pro Hac Vice" work for "Seymour" (the head of the Criminal Defense Practice at the time). Mr. James noted that the work had ended and was not particularly significant. This was an indication that Ms. Lewis was lying and simply did not wish to do the work. This was reported to Allan Fox and he did nothing. In fact, he supported Ms. Lewis.

32.     On or about December 1, Allan Fox says to me, regarding Jennifer Lewis' skillset, "I think that Tammy may have got one over on me.  She said that she was good." This was an indication that Mr. Fox, sua sponte, knew or believed that Ms. Lewis was incompetent or lacked the skillset to be supportive of anyone, but chose to assign Ms. Lewis to the Plaintiff instead of allowing him to hire staff from outside of Legal Aid as all members of Senior Staff regularly did.  This was intentionally done to harm the Plaintiff and to create such an environment that the emotional isolation and lack of support would compel the Plaintiff to quit.

33.     On or about the beginning of December 2011, the Plaintiff was befriended by Tina Kemp-Bland.  She was the Deputy Director of Human Resources.  According to Allan Fox, she was "responsible for all of the paper work" in HR, but that "she would never be made the head of HR."  This was an indication that Mr. Fox had no practical substantive knowledge in HR, yet LAS hired him as the CHRO.  This illustrates that he was hired based on a personal connection to the Board and not qualifications.  According to Ms. Kemp-Bland, "Allan regularly lied on HR staff."  Ms. Kemp-Bland mentioned that, at one point, she "refused to attend Senior Staff meetings in person and would call in despite being in the office."   These behaviors were an indication that he had an innate opposition to Black professional staff who, reporting directly to him, had skillsets that exceeded his own.  The fact that he would say that the Tina Kemp-Bland who was the person who actually managed the entire HR operations while Mr. Fox sent out notices about Spanish classes would not ever be the head of HR is telling.  He would not hire or even consider Ms. Kemp-Bland for the CHRO job, despite her qualifications, and did not want the Plaintiff at Legal Aid and, therefore, orchestrated an incessant pattern of

insubordination that that he and the Practice Heads would support until the Plaintiff resigned.

34.    On or about December 12, 2011, the Plaintiff informed Allan Fox that Jennifer Lewis had registered for the wrong on campus interview dates, despite having all of the correct information on a spreadsheet. There was no consequence and the issue was never addressed. Mr. Fox supported Ms. Lewis and not the Plaintiff who was a member of Senior Staff.

35.    On or about December 12, the Plaintiff asked Jennifer Lewis to update the Fordham Law event dates. It was never done and Mr. Fox was informed and he did nothing. He supported Ms. Lewis and undermined the Plaintiff/Director of Legal Recruitment. The Plaintiff/Director had no recourse.

36.    On or about December 12, the Plaintiff asked Jennifer Lewis to confirm the receipt of an application. It was never done. Mr. Fox was informed and he did nothing. He supported Ms. James. The Plaintiff also observed that Allan Fox would assign tasks to Jennifer Lewis that would take priority over Recruitment tasks. The Plaintiff also observed Mr. Fox "helping" Ms. Lewis with "mail merge" letters. This suggested that Ms. Lewis did not have the skillset to send emails/letters en masse which is a basic skillset for her role. The fact that he had to show an administrative person how to do a "mail merge" (which is a term that has been obsolete for 20 years) illustrates the nature of the special relationship and Ms. Lewis' lack of ability in the most basic way.

37.    As a result of Ms. Lewis' unresponsiveness and indifference, the Plaintiff began to chronicle the behavior. This was done in an effort to try to make sense of what was going on as the Plaintiff began to experience chest pains and daily feelings of anxiety and

13

dread. The feelings were so profound that he would experience anxiety attacks from his home train station to the Fulton Street stop. The mere mention of the name "Fulton Street" creates anxiety.

38.     On or about December 13, 2011, Allan Fox walks into the Plaintiff's office and says "I see that you're a come in early stay late kind guy. I check my email and work from home using my laptop and sometimes I don't come in because there's a problem with the train." This was an indication that the Plaintiff never had any issues with either coming to work, or coming to work or meetings on time, which Mr. James would suggest. It should be noted that the Plaintiff has never been late to a Senior Staff meeting and has only missed 2 in 5 years. Other members of Senior Staff regularly show up late or call in from home and they are never chided or insulted as was done to the Plaintiff.

39.     On or about December 15, Steve Banks assigned Bernette Carway-Spruiell to assist the Plaintiff. Because of the administrative staff upheaval and insubordination, the Plaintiff requested to see Ms. Carway-Spruiell's resume. Ms. Carway-Spruiell took umbrage and the Plaintiff relented. Ms. Carway-Spruiell was a "good friend" of the Attorney-in-Chief and they had worked on "union issues" together. Ms. Carway-Spruiell was an administrative person, but was respected Society-wide as a de facto Senior Staff member. This is important because, upon Mr. Banks' abrupt departure, Ms. Carway-Spruiell would then align herself with the new Attorney-in-Chief and be assigned the task of raising the level of hostility. The effect of Ms. Carwway-Spruiell's behavior had a particularly deleterious effect on the Plaintiff's physical and mental wellbeing as the Plaintiff had seen Ms. Carway-Spruiell as family and someone that he could trust as he had to exclusively rely on her alone for support.

40. On December 16, 2011, Allan Fox compels the Plaintiff to allow Jennifer Lewis to attend a meeting that University of Pennsylvania had requested with the Director. This is in light of an already demonstrated pattern of incompetence and insubordination. This was yet another act of orchestrated insubordination facilitated by Allan Fox. Ms. Lewis' contribution to the 45 minute meeting was pointing out that Legal Aid had "practices and not divisions." Legal Aid had previously referred to its teams as Divisions, e.g. Criminal Defense Division ("CDD"), Juvenile Rights Division "JRD", etc. At some point, there was a change to Practice instead of Divisions. While Ms. Lewis was, in fact, accurate, her point was of no consequence to the representative and was not particularly helpful.

41. The Plaintiff repeatedly brought the issue of Ms. Lewis' behavior to Allan Fox's attention and he refused to take any action or to allow the Plaintiff, as Ms. Lewis' supervisor, to take any corrective action. The Plaintiff asked Mr. Fox repeated about the motivation for the behavior and he provided no response other than to say "look forward." The white members of Senior Staff regularly discipline, instruct, and even yell at staff, yet LAS would not allow the Plaintiff to correct or address the behavior and supported and encouraged the insubordination.

42. On December 20, 2011, the Plaintiff had a meeting with Allan Fox and Steve Banks about quitting. This was an indication that the Plaintiff was being affected by the pressure of the stress, isolation and hostile work environment that was created by Mr. Fox and supported by the Practice Heads.

43. On December 21, 2011, Allan Fox sent the Plaintiff the "Protocol for days off" which requires that the employee submit the request to the immediate supervisor. Jennifer submitted it to Allan Fox, who was not her immediate supervisor, and then he

submitted it to the Plaintiff.   This was yet another example that Mr. Fox was encouraging

and supporting Ms. Lewis' virulent insubordination and disrespect of Plaintiff.

44.      On December 22, 2011, Allan Fox took the HR and Recruitment teams to Cabana

restaurant at the South Street Seaport.   He made statements to suggest that he was

monitoring the Plaintiff's email.   He said, "You don't get that many emails." He also

admitted to checking his Facebook page and updating his status.   This was an indication

that Mr. Fox was monitoring the Plaintiff's email, which is not illegal, but he never

monitored the emails of Senior Staff.   He was only monitoring the Black male Plaintiff's

email which is an indication of the disparate treatment that only the Plaintiff, as a

purported member of Senior Staff.

45.      In November, 2011, the Plaintiff requested that Jennifer Lewis register for the

George Washington/Georgetown on Campus interview event, which was scheduled for

December 2011.   On the Friday afternoon, on or about December 17th, at about 1:15pm,

the Plaintiff sent a reminder email because Ms. Lewis had never responded to any of the

prior emails.   The Plaintiff left the office about 6:15pm and noticed that the door to Ms.

Lewis' office was ajar and that the lights were out.   The Plaintiff reasonably believed that

Ms. Lewis had registered for the event and that an email would be forthcoming.   When

the Plaintiff arrived across the street from his home he received an email from Ms. Lewis

indicating that she did not do "any" of the assignments.   The Plaintiff then asked

specifically, "but did you register for Georgetown/GW?' there was no response, so the

Plaintiff then turned around and went back to Legal Aid's office at 199 Water Street.

When he got back to the office, he realized that passwords and user IDs were needed

which he did not have.   As a result of Ms. Lewis behavior, the Plaintiff sent an email to

Ms. Lewis indicating that he was "not comfortable" relying on her.   Allan Fox was

informed about this and supported Ms. Lewis by threatening to fire the Plaintiff.

46.   The following Monday, Allan Fox threatened to fire the Plaintiff and said that he

was "shocked that someone with EEO experience would send such an email" and that the

Plaintiff "would be fired" if he "could not work with her." Ms. Lewis committed a

brazen act of blatant insubordination, and then Mr. Fox threatens to fire the Plaintiff.

This threat was outrageous by any objective legal standard relative to the workplace. It

was yet another indication of his special relationship with Ms. Lewis and Mr. Fox's

commitment to creating a hostile work environment for the Plaintiff in order to

undermine, embarrass and emotionally harm the Plaintiff.

47.   On or about December 25, 2011, the Plaintiff gave holiday gifts to Allan Fox

(book about Buddhism), Steve Banks (a red tie), books to Seymour James, Tamara

Steckler and Adrienne Holder; Jennifer Lewis was given a book about the First year of

Law School and Monique Vorms another book.  This was an indication that the Plaintiff

was trying to convey that not only did he wish to be part of the team, which he also was

trying to cultivate amicable working relationships with subordinates.

48.   Monique Vorms complained to Allan Fox that she was offended by the gift by the

Plaintiff and hat she was offended because she was a Jehovah Witness and they do not

celebrate the holidays. The Plaintiff had no prior knowledge of Ms. Vorm's faith or lack

thereof. Ms. Vorms could have told the Plaintiff, contemporaneously, that she did not

accept gifts.  Instead, she filed a "complaint" against the Plaintiff to Allan Fox.  This was

an indication of the special relationship that Mr. Fox had with both Ms. Vorms and Ms.

Lewis, both of who received raises from Mr. Fox when LAS' policy is that employees,

especially support staff and temps, do not get personal raises. Raises, albeit rare, are awarded as a percentage (as negotiated) then provided to all staff. Individual raises are presumably never afforded, but Jennifer Lewis and Monique Vorms received them and other staffers did not and were not aware.

49.     On or about December or January, the Plaintiff introduces his wife and daughter to Bernette Carway-Spruiell in her office. The Plaintiff also introduced Ms. Carway-Spruiell to a former Parks Department colleague who had stopped by to visit and another personal friend. This illustrates the personal connection and trust that the plaintiff had with Ms. Carway-Spruiell and why he relied on her expertise in administrative matters, i.e. spreadsheets, distributions lists, etc.

50.     On December 29, 2011, the Plaintiff sent five (5) emails to Jennifer Lewis and copied Allan Fox about an applicant, TN (initials used to protect the anonymity of the applicant). Ms. TN. had requested materials. Ms. Lewis never sent them. Mr. Fox was informed and he did nothing. He supported Ms. Lewis and undermined the Director of Legal Recruitment and Diversity Officer.

51. Allan Fox began to request "weekly submissions of the Plaintiff's work. This, according to Mr. Fox was requested from all of his direct reports. The Plaintiff, who purportedly was in Senior Management was the only Senior Manager who had to comply with such a request. This request was only made of clerical and administrative staff and the Plaintiff. This was disparate treatment relative to other Senior Staff and insulting to the Plaintiff as a Black professional with 20 years of experience. The Plaintiff reasonably believes that LAS will not be able to produce any "weekly submissions" for anyone in Senior Staff except for him, the Black male.

52.     On January 4, 2012, the Plaintiff informed Allan Fox that Jennifer Lewis "doesn't do anything that I asked her to do." Allan's response was "She'll do it when I tell her to do it." This was, yet again, another illustration of the special relationship between Mr. Fox and Ms. Lewis and his commitment to undermining the Plaintiff as a Black male professional by removing the tools usually associated with management, e.g. counseling, progressive discipline, write-ups, performance improvement plan, evaluations, etc. Mr. Fox and Legal Aid would not support the Plaintiff in any aspect and encouraged insubordination.

53.     On January 6, 2012, Allan Fox placed an event on the Plaintiff's calendar without ever sending an invite. When the Plaintiff raised the issue, he said "I don't know if you had outlook at your old job, but I sent an invite." There was never any invite. Also, this incident was the second time that Allan Fox had placed something on the Plaintiff's calendar and, consequently, the Plaintiff had to cancel a Doctor's appointment. This was intentionally done to add to the mental stress of the daily insubordination and Management orchestrated torment. The result was having to cancel a dr.'s appointment.

54.     On January 10, 2012, the Plaintiff returned a call to an applicant, R.N. Ms. N. called to complaint about "repeated incompetence at Legal Aid. " She said that she would go "all the way to the top of Legal Aid and the Board." The Plaintiff apologized to the applicant and advised Jennifer Lewis to send the materials "asap." Ms. Lewis never responded. Mr. Fox was aware and took no action against Ms. Lewis or in support of the Plaintiff.

55.     On or before January 11, 2012, Allan Fox encourages Jennifer Lewis and Monique Vorms to file harassment and discrimination complaints against the Plaintiff.

Employees who did not respond to emails from the Plaintiff, and failed to perform basic

tasks and who could not be evaluated or disciplined by the Plaintiff were encouraged by

Mr. Fox to file bogus, malicious and defamatory harassment complaints against the

Plaintiff. Since the Plaintiff did not resign within the first 3 weeks, which was Mr. Fox's

goal, he encouraged Ms. Lewis and Ms. Vorms to file bogus, baseless and wholly

fabricated and defamatory complaints against the Plaintiff.

56.     On January 11, 2012, Mr. Fox encourages Ms. Vorms to file a bogus complaint

against Ms. Carway-Spruiell. Jennifer Lewis sends a complaint, written by Monique

Vorms, to the Plaintiff about Bernette Carway-Spruiell. Ms. Lewis who never responded

to emails or performed requested and who did not register for an event at George

Washington/Georgetown law, was now sending complaints directly to the Plaintiff. This

was Ms. Lewis, with the support of Allan Fox, using Legal Aid's complaint procedure as

a weapon against the Plaintiff. Please note that the Plaintiff, on numerous occasions,

recommended that the LAS complaint procedure should include a "good faith" clause, so

that employees understood that complaints were encouraged, but that they should be filed

only in good faith. Bad faith would be baseless submission filed solely for the purpose of

wrongfully and maliciously harming the alleged respondent. The suggestion was

ignored.

57.     On January 11, 2012, Jennifer and Monique Vorms send a complaint to Allan Fox

about the Plaintiff. The Plaintiff was never presented with the complaint and never saw

the complaint, despite requesting to see it. This was all orchestrated by Allan Fox and the

Practice Heads to create a hostile environment which would ultimately compel the

Plaintiff to resign.

58.     On January 12, 2012, Allan Fox tells the Plaintiff that "we have to give Monique

Vorms more money because she was only supposed to do data entry." Ms. Vorms herself

told the Plaintiff that she was "managing four spreadsheets" which is not data entry.

Allan Fox never told the Plaintiff about any terms and conditions of Ms. Vorms'

employment or about restrictions or limitations. This illustrated the special relationship

between Ms. Vorms and Mr. Fox such that she, a temporary employee, would be

amenable to lying and sabotaging the Plaintiff for compensation. Note that LAS support

staff do not get individual raises. This practice of hiring a temporary employee and

providing financial incentive as motivation to be uncooperative with the Plaintiff will be

repeated again.

59.     On January 12, 2012, the Plaintiff checks with Tina Kemp-Bland (Deputy

Director of Human Resources) and she explains that she has not seen Ms. Vorms'

contract and, therefore, has no information. This means that Tina-Kemp-Bland, who was

privy to all of the contracts regarding temps, was not privy to the Vorms contract which

was managed exclusively by Mr. Fox, which is another illustration of the relationship and

the control that Mr. Fox had. It is important to note that the Plaintiff discovered that

Legal Aid was paying a company, Brandemix, where Mr. Fox had either been an

associate, partner or friend of the Principal to perform the same posting services that LAS

was already performing internally. This discovery was another reason for Mr. Fox's

motivation. LAS knew of the relationship between Brandemix and Mr. Fox. The

relationship continues.

60.     January 13, 2012, the Plaintiff was having a conversation with Patricia Bath and

asked "I wonder why Allan hired me and would then insult me?' Ms. Bath said "Allan

didn't hire you. The Committee hired you." This was an indication that Mr. Fox did not

ever really want to work with the Plaintiff, but had no objective reason to dissent.

Consequently, his goal was to sabotage and undermine from the outset.

61.     On or about January 13, 2012 the Plaintiff had a meeting with Steve Banks, Allan

Fox and Scott Rosenberg. The Plaintiff requested to see the written evaluations or

feedback from the committee because he believed that it would reveal something telling

about anyone on the Panel that interviewed him. The Plaintiff never mentioned Mr. Fox.

As a result of the request, Allan Fox abruptly stood up and declared "I will not stand here

and listen to this!" Then he abruptly stormed out of the meeting. The Plaintiff then said

"If I may quote the Bard, me thinks he doth protests too much." This was Mr. Fox's

admission by his actions that he was, in fact, orchestrating a hostile work environment.

62.     On January 16, 2012, the Plaintiff drafted a sixty-eight (68) paged complaint

against Allan Fox, the Chief Human Resources Officer that alleged hostile work

environment and disparate treatment based on race. This is an indication of the level of

stress, the level of insults and pressure such that it prompted a lengthy drafting of a

complaint submitted on MLK day. The irony was that on a day that America celebrated

the life and achievements of Dr. King, that the Black Plaintiff was compelled to defend

himself against threats, insults and a hostile work environment fueled by racism on MLK

day.

63.     On January 18, 2012, the Plaintiff gets and email from Janet Rivera that "invoices

were past due" and that "Allan and Jennifer were involved." The Plaintiff discovered

that Jennifer Lewis was using the Plaintiff's information to register at accounts using the

Plaintiff's information. The Plaintiff never authorized her to use his information. Allan

Fox and Scott Rosenberg were aware of this.  Scott Rosenberg, the General Counsel and

Allan Fox's friend, said that the repeated and unauthorized use of the Plaintiff's email

address, etc. was a "just a mistake."  This was an example that Rosenberg and Fox were

collaborating on the effort to oust the Plaintiff by supporting insubordination which

created a hostile work environment.

64.     On or about January 18, 2012, there was a meeting with Steve Banks and Allan

Fox wherein Steve directed Allan Fox to apologize to the Plaintiff.  Mr. Fox "apologized"

for his behavior.  Consequently, the Plaintiff decided that he would not file any

complaint.  Scott Rosenberg told that plaintiff that "it would not have been good for you"

had he filed his complaint.  This statement suggested that Scott Rosenberg, who knows as

the General Counsel that employees have a right to complain, file suites, etc. without

retaliation,  was threatening the Plaintiff with the specter of retaliation.

65.     On January 19, 2012, Tamara Steckler responds to an email that was sent directly

to Jennifer Lewis.  Tamara Steckler was copied on the note.  Allan Fox, Jennifer Lewis

and Tamara Steckler were all friends.  Ms. Steckler's nickname for Ms. Lewis was

allegedly "J-Lo."  Ms. Lewis never responded.  This was an example of Tamara Steckler

supporting the insubordination, and specifically, the willful unresponsiveness of Ms.

Lewis in furtherance of the LAS' efforts to create such an environment that the Plaintiff

would resign from the stress.

66.     On or about January, 21, 2012, the Plaintiff heard yelling in the office and decides

to investigate.  The Plaintiff was in the buildings on September 11, 2001 and is

particularly sensitive to even slight disturbances.  The Plaintiff exited his office and

walked to the right, the direction of the disturbance.  He walked 3 doors down and

observed a member of Senior Staff yelling at Toni Beshara. Ms. Beshara was crying and trembling. The Plaintiff, looked at both of them and said, "this door should probably be closed." This was an indication that Legal Aid manager regularly yelled and berated support staff with impunity. The plaintiff never yelled at anyone at Legal Aid, despite wanting to respond in kind when he was yelled at by Management and Staff.

67.     The Plaintiff eventually decided to hire Ms. Beshara because he was desperate for administrative support. When the Plaintiff first started, there was 3 support staff. At the time of hiring Ms. Beshara, there was only 1. The Plaintiff actually wanted to hire an employee who was in Development (SB), but he was informed that she would be promoted in Development. Upon information and belief, the defendants knew that Ms. Beshara had been a difficult employee and never informed the Plaintiff regarding her troubled past at Legal Aid prior to his discussions about hiring her. The Defendants, who would not allow the Plaintiff to hire any staff from outside of Legal aid, knew that Toni Beshara, Bernette Carway-Spruiell, Monique Vorms and Jennifer Lewis were all difficult employees and intentionally directed them to the Plaintiff. This was all orchestrated and managed by Allan Fox and supported by Seymour James, Tamara Steckler, Justine Luongo, Adrienne Holder, Aida Ramos and the Lawyers Union (who apparently had a preferred internal candidate for the Recruitment position that was eventually awarded to the Plaintiff.

68.     Allan Fox, before the Plaintiff hired Toni Beshara, told the Plaintiff, "I don't think that MIS would be too sad to see her go." This was an indication that he knew that there would be a problem but never counseled or suggested that that he should understand Ms.

Beshara's work history at Legal Aid, which was not exemplary. This was done to harm the Plaintiff's ability to perform tasks.

69.     During Ms. Beshara's first 2 weeks, the Plaintiff, in the presence of Bernette Carway-Spruiell, physically stood beside Ms. Beshara and instructed her how to respond to emails. This was done because Ms. Beshara, after observing the amount of work to be done in Recruitment and because she discovered an email exchange between Jennifer Lewis and Monique Vorms contemplated going back to MIS. The Plaintiff needed staff and was trying to convince her to stay. This was an indication of the Plaintiff trying to create a supportive and amicable relationship with Ms. Beshara.

70.     On or about January, 2012, The Plaintiff almost accidentally walked into Ms. Beshara as both were quickly walking through perpendicular hallways. Just prior to colliding with Ms. Beshara, the Plaintiff said "excuse me", as was to be expected. Ms. Beshara said "that was almost fun." When Tamara Steckler was told of this unusual anecdote, she said "She was only joking." The Plaintiff then thought 'Would Ms. Steckler have had that same position if he had made such a joke to a female employee?' This is an example of how Legal Aid has different standards for support staff, white employees and Black employees. The Plaintiff personally observed, while on a committee call, Ms. Steckler passionately calling for "discipline and or termination" for a Black male employee in the absence of any evidence other than rumor. Ms. Beshara's behavior's behavior, by any indicia, was outrageous and not appropriate for the workplace. This also illustrates Ms. Beshara's idiosyncratic personality type, which would manifest many times in the future.

71.     On or about January 20, 2012, the Plaintiff was heading to a kickboxing class, as he had already left work, at the Brooklyn Children's Museum in Crown Heights.  While en route, the Plaintiff received a call from Toni Beshara and Bernette Carway-Spruiell at about 6:30pm that they were having some challenges.  After the class ended at 7pm, the Plaintiff went back to 199 Water Street to work with Ms. Beshara and Ms. Carway-Spruiell.  Afterwards (about 9:15pm), the Plaintiff took both Ms. Carway-Spruiell and Ms. Beshara to dinner at a restaurant at the Hideaway South Street Seaport at 22 Peck Slip.  This is yet another example of the Plaintiff trying to establish amicable working relationships with subordinates and support.  It is important to note that he paid for them out of his own money as there was no budget for paying for meals for staff.

72.     On February 1, 2012, Jennifer Lewis was instructed to send rejection letters.  She never sent them.  The defendants moved Jennifer Lewis and allowed her to continue to be involved in Recruitment work.  The Defendants never consulted or asked the Plaintiff about whether he would evaluate, assess or implement corrective action as a Senior Manager.  The Defendant effectively negated any presumed supervisory influence in both the short term and the long term.  Not only was this outrageous behavior, it added to the hostile work environment and further insulted the Plaintiff as Legal Aid decided to allow Ms. Lewis to still work on Recruitment issues despite her lack of competence, insubordination and efforts to sabotage the work.  It is important to note that all of the areas headed by members of Senior Staff are represented in the Legal Aid Annual Report except for Legal Recruitment and Diversity.  The Plaintiff pointed this out twice and the practice continues.  This sends a clear message that Legal Recruitment & Diversity, when headed by a Black male, is not valued as part of the Legal Aid brand.

73.     In February 2012, the Plaintiff, at the suggestion of Ms. Bernette Carway-Spruiell, led a rendition of 'Lift Every Voice and Sing' (The Black National Anthem) in conference room 6061. Many in attendance videotaped the singing in their cell phones. This point is made to illustrate the influence that Ms. Carway-Spruiell had, as a management surrogate. The Plaintiff did not want to sing at all (for many reasons), yet he felt compelled to do so because Ms. Carway-Spruiell suggested it. The Plaintiff was embarrassed and humiliated. In his 5 years, he had never seen anyone else asked to sing 'Lift Every Voice and Sing.'

74.     On or about February, Scott Rosenberg directs Recruitment to do data entry to be placed into Law Manager. The Plaintiff never liked this direction and wondered why he could not make decisions about his own department. This was yet another prong of humiliation, i.e to have the Director of Legal Recruitment and Diversity doing data entry fulltime, all the time every day because of the volume. This Plaintiff told his wife, whose response was "Why would they have someone at your level doing data entry?" It was the next stage in the effort to humiliate the Plaintiff. The Plaintiff felt humiliated, insulted just like the way that support staff, most of whom, are people of color feel every day. The difference was that he was a member of Senior Staff and was treated like "support staff."

75.     On or about February 8, 2012, Toni Beshara finds an email communication between Jennifer Lewis and Monique Vorms that suggests that they were intentionally trying to sabotage the Recruitment work. In the email, both women seemed to delight at the Plaintiff's consternation regarding missing or inaccurate work product that was submitted by both of them. This was evidence that Ms. Vorms and Ms. Lewis were

knowingly sabotaging and disrupting the efforts of the Plaintiff. Allan Fox and Scott Rosenberg did nothing.

76.     On February 14 (Valentines Day), 2012, the Plaintiff bought flowers for Ms. Beshara and Ms. Carway-Spruiell. It was at that time that the Plaintiff learned that Ms. Carway-Spruiell was allergic to flowers because of "respiratory issues." Consequently, Ms. Carway-Spruiell did not want the flowers. This was yet another effort to acknowledge staff and to foster an amicable relationship with staff.

77.     On or about the end of February, the Plaintiff decided that he would bring Toni Beshara to a meeting with Rachel Peckerman of New York University Law School. Apparently, there was a dispute between Ms. Beshara and Ms. Carway-Spruiell unbeknownst to the Plaintiff. The dispute seemed to agitate Ms. Beshara. As the Plaintiff and Ms. Beshara were leaving 199 Water Street (LAS' headquarters), Ms. Beshara began audibly yelling at the Plaintiff in the lobby of 199 Water, continued yelling while walking up Fulton street and on the subway. When the Plaintiff and Ms. Beshara get to Ms. Peckerman's Office, Ms. Beshara sits in the office with her seat directly facing the Plaintiff and perpendicular to both Peckerman and the Plaintiff. This was an indication of Ms. Beshara's personality which was known to be difficult by Legal Aid management. In addition, however, Ms. Beshara was emboldened by the fact that she knew that the Plaintiff was not supported LAS management and so she directed hostile and defamatory behavior towards the Plaintiff. This is in direct contrast to when she reported to another White male member of Senior Staff who was observed yelling at Ms. Beshara as she sat and cried and trembled. Ms. Beshara and other support staff felt empowered by LAS management to disrespect, insult, threaten, defame or otherwise

undermine the Plaintiff by contributing to a hostile work environment, but when dealing with others, she was very deferential and respectful.

78.     Allan Fox and Scott Rosenberg both saw and were aware of the email referenced in paragraph 75. They did nothing. They supported Ms. Beshara and never addressed the issue.

79.     Toni Beshara told the Plaintiff that she wanted to take Janet Rivera (a finance staffer) out for her birthday and invited the Plaintiff to go with them. The Plaintiff, who didn't even know Ms. Rivera) went out with them to Niko Niko Sushi Bowl on Pine Street. The Plaintiff was trying to create an amicable environment with subordinates and so he went at Ms. Beshara's urging. The Plaintiff even bought a gift for Ms. Rivera. Once again, the Plaintiff was trying to behave in an amicable manner.

80.     In March 2012, the Plaintiff began to observe that Toni Beshara was staying at work until 12am and 1am. According to the "rumor mill", 'the new Recruitment Director was making her stay late and that he and Bernette were "leaving early." There was no need for anyone, by March of 2012, to be staying later than 7pm. Ms. Beshara had decided to stay, on her own, because she wanted to accrue comp. time. Unfortunately, as a Deputy Director she was not entitled to such time. The Plaintiff sent Ms. Beshara an email after chatting with Steve Banks informing her that it was not necessary to stay that late and that she could not accrue comp. time. Ms. Beshara informed the Plaintiff that Scott Rosenberg told her that she could "stay as late as she wanted." Once again, this is yet another example of Legal Aid supporting the undermining of the Plaintiff and contradicting the former Attorney-in-Chief.

81.    On or about March, 2012, the former Attorney-in-Chief assigned Aida Ramos as the "contact when supplies were needed." Unlike others in Senior Staff, the Director of Recruitment had no supply closet or repository wherein office supplies were kept. Consequently, Ms. Ramos, a member of the Senior Staff, would be the contact solely for supplies. This is important because Ms. Ramos, who had no knowledge of Legal Recruitment and Diversity whatsoever was eventually assigned to be the Plaintiff's boss. No other member of Senior Staff reported to a Director. This was disparate treatment directed solely at the Plaintiff.

82.    On or about April 18, 2012, the Plaintiff asked Toni Beshara to update information on Lasnet (internal library) regarding to applicants who received "outstanding" as a rating and were to be seen by the then CDP practice head, Seymour James. The task was never done. This was another example of Legal supporting the subordinates and encouraging insubordination. Mr. Fox and Mr. Rosenberg were aware of this and did nothing.

83.    On April 19, 2012, the Plaintiff asked Ms. Beshara about the retention of inordinately high piles of paper and she said, in a raised voice "Fowel" – "F-O-U-L" – then she calmed down then asked "Why are you questioning me about things that will affect operations?' The Plaintiff replied, "Because I am the Director", she then stormed out of the meeting. This illustrates the volatility of the Ms. Beshara and that her volatility was only directed towards the Black male Plaintiff. Ms. Beshara behaved like a supplicant when interacting with other members of white Senior staff and the Senior management preferred African-Americans except the Black Plaintiff. It should be noted that Ms. Beshara made defamatory about the Black male supervisor of Shared Services to

the Plaintiff. She said that he was "eating and didn't want to work." What she did not say was that it was 7pm and that he was having lunch at the time. More importantly, Ms. Beshara had more than a month to request assistance from Shared Services, but would regularly wait until the final hours on a Friday to request help. Management knew about what was said about the supervisor of shared Services and did nothing, as they did nothing to support the Plaintiff.

84.     On or about April 26, 2012 the Plaintiff was leading a Recruitment meeting with Toni Beshara and Bernette Carway-Spruiell. During the meeting the Plaintiff (director) decided that work would be redistributed as Ms. Beshara seemed to either have difficulty or was willfully waiting until the last minute to do work. As a result, Ms. Beshara looked at the Plaintiff and Ms. Carway-Spruiell and said "The two of you must be out of your fuckin minds!" Another illustration of the behavior that was directed only towards the Black male Director. Support staff felt particularly emboldened when interacting and dealing with the Black Plaintiff. These same employees are often shrinking violets are profoundly obsequious when interacting with LAS Senior Management and Senior Staff.

85.     On or about April 28, 2012, the Plaintiff informed the former Attorney-in-Chief and Scott Rosenberg about what occurred (Beshara yelling "the two of you must be out of your fuckin minds!") with Ms. Beshara. Mr. Fox, Mr. Rosenberg and Legal Aid knew about this and did nothing to address the issue. In fact, they supported Ms. Beshara. Ms. Rosenberg, as a purported rationale or mitigating factor, suggested that "maybe Ms. Beshara had been raped." The Plaintiff was completely taken aback as the assertion neither relevant nor proper. The Plaintiff was particularly sensitive to the assertion with the history of fabricated rape of white women serving as the basis for lynching of Black

men.  Ms. Beshara was clearly rude, profane and offensive at a time when there was no

basis for such behavior.

86.     On or about May 1, 2012, the Plaintiff requested a Black Berry (BB) so that Ms.

Beshara could respond to emails remotely.  An LAS BB is a perk.  This was done solely

to assist Ms. Beshara to be able to respond to emails remotely because she seemed to

have challenges.  It was also done, once again, to create an amicable environment.

87.     On or about May 3, 2012, Toni Beshara entered the office of the Plaintiff, walks

to the edge of his desk and asks "Why didn't you ask me for permission to get me a black

berry?"  The Plaintiff was shocked.  Ms. Beshara repeats the question in an agitated

stated state.  Confused by the questioning and conscious of the door being open and that

Ms. Beshara could be heard speaking at a high decibel level, the Plaintiff responded by

saying "Toni go back to your office" and pointing to the door while his elbow was

positioned on his desk.  This was repeated twice.  Ms. Beshara then turned, walked to the

door, closed the Plaintiff's door from the inside and walked back to the Plaintiff's desk in

an aggressive and confrontation posture.  She had picked a hangnail on her index finger

and wiped the blood on a post-it in the Plaintiffs office before she actually left.  This

behavior illustrates the hostility that LAS was encouraging and supporting that was only

directed towards the Black male Plaintiff.

88.     On Monday, May 7, 2012, the Plaintiff requested that Ms. Beshara add some

names to the spreadsheet, also referred to as a "tracker."  Ms. Beshara refused to do it.

Mr. Fox and Mr. Rosenberg knew about this and supported Ms. Beshara and did nothing.

89.      On or about May 9, 2012, the Plaintiff asked Ms. Beshara to register for an

Emory Law School event and was informed that it should take "2 minutes."  Ms. Beshara

responded by saying that there was a "$600.00" cost and that she "needed advice." According to Emory, there was no cost and the event was never registered by Ms. Beshara. This illustrated the lack of Ms. Beshara's competence of which LAS was aware. Yet, LAS knowingly did not disclose to the Plaintiff that Ms. Beshara had been known to be difficult because LAS' management intended that this person would be used to solely to undermine, threaten, intimidate and insult the Plaintiff. The Plaintiff subsequently discovered that Ms. Beshara had issues in MIS and had an encounter with Pat Bath.

90.     On or about May 10, 2012, the Plaintiff had repeatedly requested information from Ms. Beshara that was required by the Criminal Defense Practice Committee. The information was never provided. Messrs. Fox and Rosenberg knew about this and did nothing.

91.     On or about May 17, 2012, the Plaintiff observed that Ms. Beshara would regularly take the day off before CDP committee meetings, which was when much of the preparation would occur. She did this to intentionally affect the processing of work and the tenor of meetings. Messrs. Fox and Rosenberg knew about this and did nothing. The Plaintiff had no authority to address the issue as LAS eviscerated his management disciplinary cache within the first week.

92.     On or about May or June, 2012, the Plaintiff visits Bernette Carway-Spruiell in Brooklyn Hospital who had been ill for a few days. The Plaintiff visited her because she had been ill for a few days and he was concerned that the illness was serious. Ms. Carway-Spruiell was like "family" to the Plaintiff and the Plaintiff relied upon her administrative expertise. If something happened to her, then the Plaintiff would have no

administrative support, so he went to see how she was. Also, Ms. Carway-Spruiell never liked for staff to know that she was ill, so the plaintiff would only share the illnesses and absences with Steve Banks who was a close friend and former Union colleague of Ms. Carway-Spruiell.

93.     On June 7, 2012, the Plaintiff gets a commendation from NYU law school regarding how the changes have "reaped reputational rewards for LAS." This goes to the positive affect that the Plaintiff had, despite working in an environment where he was isolated, not supported and his ideas were ignored.

94.     On June 8, 2012, Scott Rosenberg and Steve Banks had edited a communication that was to be sent to the law schools. Steve sent the communication to the Plaintiff with the authorization that it could be sent to the law schools. The Plaintiff sent the communication to Toni Beshara with an instruction to "please send it out." Ms. Beshara responded that she had an issue "with a semi-colon" that was in the 3rd paragraph of the 4 paragraph email. The Plaintiff explained to her that it was vetted, edited and approved by Steve and Scott and that "if it was good enough for them that it was good enough for" him. Ms. Beshara sent the email to Scott Rosenberg (without copying the Plaintiff) who then sent the Plaintiff an email instructing the Plaintiff to "listen to Toni." The Plaintiff sent an email to Scott Rosenberg reminding him that it was he (Scott) who had reviewed and edited the document and then ending the email with "thank you and have a nice day." Mr. Rosenberg then walks about 50 yards from his office to the Plaintiff's office and sat there glaring at the Plaintiff with his arms folded. When the Plaintiff asked Mr. Rosenberg why he was in his office just glaring at him, Mr. Rosenberg replied, "because you wrote 'have a nice day' and it was not sincere." He then told the Plaintiff that he

"has grammar issues." The Plaintiff then retorted "Grammar issues? What? Do you know that people pay me to talk? Do you know that I have had articles published? Show me these grammar issues! I don't know why you people hired me. Everyday I'm insulted and threatened." Mr. Rosenberg's replied was "I didn't hire you." This was an indication of Scott Rosenberg sending a clear message that he did not hire the Plaintiff, that he was comfortable insulting the Plaintiff and that he was part of the Allan Fox's plan to create a hostile work environment such that the Plaintiff would resign. Unless there is evidence or some factual basis of "grammar issues", the use of such a phrase is insult to a professional Black person similar to "oh, you speak so well, etc."

95.     On June 25, 2012 and on June 26, 2012, Ms. Beshara never showed up for work and never informed either Scott Rosenberg or the Plaintiff. Legal Aid did nothing. Upon information and belief, if Ms. Beshara were a Black employee at LAS who just didn't show up for work, there would have been serious consequences. It was an indication that Ms. Beshara knew that she had the support of Legal Aid management and that the Plaintiff had no authority.

96.     On or about the end of May or the beginning of July Toni Beshara started to, de facto, "report" to Scott Rosenberg. There was never any discussion of this transition. It just happened based on Ms. Beshara's relationship with Scott Rosenberg. This illustrated that Mr. Rosenberg, Allan Fox's friend and next door neighbor, and Ms. Beshara had a special relationship such that he encouraged, supported and knowingly directed Ms. Beshara to engage in inappropriate and illegal behavior.

97.     On July 3, 2012, Toni Beshara communicates to the Plaintiff that she only taking direction from "Tina Luongo and Seymour James." This illustrated that Ms. Beshara had

a special relationship Mr. James and Ms. Luongo such that they encouraged, supported and knowingly directed Ms. Beshara to engage in inappropriate and illegal behavior. The end result was that Ms. Beshara had committed brazen acts of insubordination, verbally assaultive behavior, refused to change a meeting date as requested because of the Jewish holiday by Fordham law school and Legal Aid did nothing. There were no consequences for Ms. Beshara yet the Plaintiff was demeaned and regularly insulted.

98.    On July 3, 2012, there was a meeting scheduled for 2pm on July 3rd. Ms. Beshara was informed of the meeting about a week in advance and she walked into the meeting at 2:40pm. Scott Rosenberg was in attendance. She did not apologize for being late. The plaintiff had no power to do anything. Messrs. Fox and Rosenberg knew about this and did nothing.

99.    On July 10, 2012, the Plaintiff informed Ms. Beshara that there was an issue regarding the Recruitmentdocs email box. Her response was "that's your job." This was a brazen act of insubordination that was regularly encouraged by LAS and Ms. Beshara felt supported and assured that there would be no consequences for her. There were no consequences for her, but the Plaintiff was insulted and demeaned knowing that these experiences would never happen to other Senior Staff at LAS, especially those who have reputations as having bullying tendencies.

100.    On July 25, 2012, Ms. Beshara sent wrong information to the Fellowship Committee. The end result was that half of the committee was in conference room 6019 and the other was in room 6057. Another illustration of lack of competence. When she was informed of what happened, she shrugged it off, which suggested that it was not

human error, but an intentional act.  Mr. Fox and Mr. Rosenberg both knew about this and did nothing.  There were no consequences for Ms. Beshara.

101.    On August 6, 2012, Ms. Beshara sends a communication to the Sam Sue of CUNY law.  The Plaintiff never saw the communication before transmission until it was brought to his attention by Mr. Sue at CUNY law.  Staff communication with the law schools was limited and, therefore, if there was a need then they were expected to convey the reason for the communication and to show the communication to the Plaintiff before it went out.  Apparently Ms. Beshara's communication had information that conflicted with prior information.  Ms. Beshara indicated that the "CDP had instructed her to send it."  The Plaintiff knew nothing about it.  This was an indication of the special relationship that Ms. Beshara had with Justine Luongo and Seymour James.  The relationship was such that she could send misinformation to a stakeholder and there was no follow-up to ascertain why it happened, no apology to the school, no repercussions because it was supported by Legal Aid.  James, Luongo, Fox, Rosenberg knew about this behavior.  This situation was orchestrated to place the Director in a negative light vis-à-vis the law schools.  It placed the Director in a negative light and damaged the Plaintiff's reputation.  This was done intentionally.

102.    On September 25, 2012, Ms. Beshara intentionally removes information from the Recruitment website.  Tina Luongo informs the Plaintiff to check with MIS and Scott Rosenberg argued that it was a "mistake."  There are no consequences for this willful effort to sabotage the Recruitment work and it was supported by Ms. Luongo, Mr. James and Mr. Fox and Mr. Rosenberg.

103.    On or about December of 2012, Fordham Law School's (MW) contacted Ms. Beshara regarding changing the date as a result of the Jewish holiday. Ms. Beshara refused. Scott Rosenberg and Justine Luongo were both aware of this egregious behavior and there were no repercussions for Ms. Beshara. The Plaintiff apologized for the "misunderstanding." Mr. Fox, Rosenberg, James and Ms. Luongo knew about this and did nothing.

104.    On or about January of 2013, Senior Staff were instructed at the Senior Staff meeting to provide evaluations. The Plaintiff submitted an evaluation for Ms. Bernette Carway-Spruiell that included 9s and 10s (the highest ratings). Note that a request for evaluations were made, but there were no sample forms or formats provided by Ms. Fox (the Chief Human Resources officer) so the Plaintiff created an evaluation tool. The Plaintiff did not evaluate Ms. Beshara because he was afraid of her reaction to an accurate evaluation based on her actual performance. He was also fearful that there would be reprisals from Messrs. Fox and Rosenberg as a result of any negative, albeit truthful, evaluations. This also shows that the Plaintiff provided any and all information when requested. The communications at Senior Staff meetings suggests that many Senior Staffers do not regularly do evaluations, but the Plaintiff did as requested. This also illustrates that the Plaintiff had evaluated Ms. Carway-Spruiell when she performed well, but when she enlisted to sabotage the Plaintiff after Steve Banks left that the Plaintiff was in no position to evaluate her as he would not have been supported.

105.    On March 19, 2013, Ms. Steckler sent the Plaintiff an email telling the Plaintiff not to email her staff and that it goes through the committee. The Plaintiff never knew who was on the JRP Committee. Also, the Plaintiff sent an email only to those who were

identified by the applicant. The fact that the Plaintiff had no prior information and Ms. Steckler's nasty tone suggested that she was also knowingly involved in the effort to create a hostile work environment for the Plaintiff.

106.    On March 24, 2013 Ms. Steckler sent the Plaintiff a list of people to be rejected. The list contained misspellings, incorrect email addresses and no email addresses. Apparently, the information was sent to Ms. Steckler by Jennifer Lewis who had not only sabotaged Recruitment Operations, but demonstrated a profound lack of competence. Despite the lack of competence and evidence of intent to sabotage Legal Aid's Recruitment work, Allan Fox and Tamara Steckler decided that Jennifer Lewis should still be involved in Recruitment matters, albeit in an indirect manner. This was insulting to the Plaintiff, but more importantly, imprudent to have Ms. Lewis involved in Recruitment. Ms. Lewis continued to send wrong information and mis-information through the 2016 Summer season. There were never any consequences, training scheduled to address the issues. Nothing was done. In fact, Legal Aid promoted Jennifer Lewis, Toni Beshara and Bernette Carway-Spruiell as the lead administrators on the ADP Recruitment in contravention to the Plaintiff's recommendation.

107.    On or about May of 2013, Tina Kemp-Bland, who had been the Plaintiff's confidante other than Ms. Carway-Spruiell, abruptly stops communicating with the Plaintiff. This was an indication that Allan Fox, Tina's box, had threatened Tina that she should no longer communicate with the Plaintiff or he lied and conveyed information to Tina that was not true and she believed it. This was Allan Fox's effort to continue the isolation of the Plaintiff.

108.    On or about September 30, 2013, Bernette Carway-Spruiell and the Attorney in Charge of the CDP Queens office exchange nasty emails while leadership were copied on the exchange.  Bernette was the aggressor, the leadership did not intervene.  The Plaintiff sent an email to resolve the situation.  The Attorney thanked the Plaintiff and expressed that he did not "appreciate Bernette's tone and attitude."  This is an indication that Ms. Carway-Spruiell saw herself as occupying a higher status than the Black male Attorney-in-Charge and that she was supported by Legal Aid.  This also illustrates that the Plaintiff amicably and professionally addressed the issue as Ms. Carway-Spruiell did report to him and he, at least at that time, was able to manage her because she was amenable to being managed while Steve Banks was there.

109.    On September 30, 2013, the former Attorney-in-Chief commends the Plaintiff for his email that he sent to Ms. Carway-Spruiel and to the Queens Attorney-in-Chief to assuage the tension and to resolve the dispute.  This is an indication that the Plaintiff was able to manage and do his job when allowed and supported to do so.  Moreover, that the Plaintiff did not need to be micro-managed and treated like a child and asked weekly "so what are you doing?" despite the fact that management was copied on all of his emails, as directed.  They were always aware of what he was doing and the weekly haranguing was unnecessary and intended solely to insult the Black male Plaintiff.

110.    In March of 2014, the Plaintiff informed Ms. Holder that Monique Vorms, the temp. was insubordinate and uncooperative, and Ms. Holder would ask "How is a temp. causing so much trouble?  A temp.?"  The answer was that the temp had a special relationship with Allan Fox and Jennifer Lewis and was supported and encouraged by Mr. Fox and Legal Aid.

111.    In April of 2014, the former Attorney-in-Chief resigns.  Before he leaves, he

meets with all Senior Staff.  During the Plaintiff's meeting with him, the Plaintiff says

"It's going to be terrible for me here when you leave."  His response was that "Seymour

would be a good ally and Aida because Aida she is nurturing."  This was an indication

that Mr. Banks did not really understand the extent to which his colleagues had regularly

insulted and sabotaged the Plaintiff.  This also represents the rational for Ms. Carway-

Spruiell's change in behavior.  The former Attorney-in-Chief seemed to be oblivious to

the fact that Seymour James had insulted the Plaintiff multiple times within the first 2

months at Legal Aid.  Mr. James expected the Plaintiff/director of Legal Recruitment to

take dictation.  When the Plaintiff asked, "can you send me an email like Scott and

Steve?" he yelled "Why can't you send me an email?"  That statement was ridiculous,

irrelevant and was done to put the Plaintiff in his place, as a dark-skinned Negro "support

staff", in comparison to the light-skinned preferred Black status enjoyed by Mr. James.

The Plaintiff never really understood why Aida's alleged "nurturing" qualities would be

required or of value in the workplace.

112.    On or about April or May, 2014, the Plaintiff had a discussion with Bernette

Carway-Spruielle suggesting that she be "more visible at work and come in more." He

specifically said that "it would be better to be able to walk down the hall and ask a

question instead of having to communicate via text and phone." Ms. Carway-Spruielle

replied "I'm not needy like that." This was an initial sign of the behaviors that would

ensue as Mr. James, the new Attorney-in-Chief, would enlist Ms. Carway-Spruiell to

virulently antagonize the Plaintiff and to continue the acts of insubordination in an

attempt to get the Plaintiff to quit based on an environment where the Plaintiff was not welcomed or supported at all.

113.   On June 15, 2014, the Plaintiff was talking with Bernette Carway-Spruiell in her office and she said "You know, there is no boss here. We're all equal." The Plaintiff said "Ok, well you know that I rely on you for your administrative skillset" Ms. Carway-Spruiell said "Rely on me? NOT EVEN MY FUCKIN KIDS RELY ON ME!" It was at this time that the Plaintiff began to sense that Ms. Carway-Spruiell would change the nature of her relationship to the Plaintiff. The Plaintiff believes that Legal was endeavoring for there to be a conflict between Mr. Carway-Spruiell and the Plaintiff similar to the one that LAS encouraged that resulted in an investigator pulling a gun and sticking it to the side of the Bronx Practice head's head in 2013.

114.   It was around this time that the plaintiff began to have acute chest pains, headaches, insomnia, resurgence of aqua genic pruritus, anxiety attacks and depression and dizziness as a result of the work environment.

115.   On or about July or August, 2014, Ms. Carway-Spruiell convened a meeting of the volunteers that go to the law schools to elicit feedback. The Plaintiff decided that while feedback was important that it was not necessary to convene people for an in person meeting. The Director/Plaintiff did not believe that it was a good use of resources or time. The Plaintiff's idea was to elicit feedback via Survey Monkey that the volunteers would submit. Ms. Carway-Spruiell had the meeting anyway with the support of Messrs. James, Luongo, Fox, Rosenberg, Steckler. Also, because so many of the Volunteers believed that the Director of Legal Recruitment had authority and made decisions, they would direct their ire and hostility toward the Plaintiff. Prior to that

meeting, Ms. Carway-Spruiell commented he the Plaintiff spoke too "bla bla bla and too formal" and that "people at Legal Aid communicate between a 6th and 8th grade level." Therefore, he should speak at their level. As Legal Aid is a law firm, the Plaintiff was a bit taken aback. This illustrates the unorthodox and unprofessional nature of the surrogates that were identified who regularly engaged in harassing or threatening behavior. This was also another example of management supporting a subordinate instead of the Director and exacerbating an already hostile work environment.

116.   On November 24, 2014, the Plaintiff sent an email to Patricia Bath asking whether she could send materials to Harvard BLSA for the job fair. Ms. Bath replied "We can send them Monday. To whose attention?" The Plaintiff replied, "Thanks, Pat" and provided the names. Ms. Carway-Spruiell, who has had a longstanding friendship with Ms. Bath, sent an email to Pat Bath instructing her not to send the mailing. A few days later when the Plaintiff followed up to see whether it was sent, Pat Bath replied that she "wanted to help but that she was getting mixed signals." The Plaintiff, a fellow member of Senior Staff, asked her (another member of Senior Staff) for help and Pat Bath chose not to help because Bernette told her not to do it. If Allan Fox or Tamara Steckler asked Pat Bath for help and their subordinates told them not to do it, Ms. Bath would ignore the subordinate. More importantly, their subordinates would never contradict their supervisor's instruction. Pat Bath and Bernette Carway-Spruiell were friends and Pat relied on Bernette as a sounding board when discussing personal family challenges. Note that the Plaintiff asked Pat Bath for help because he now knew that Bernette Carway-Spruiell would no longer be helpful because she no longer wished to be associated with the Plaintiff once the former Attorney-in-Chief left. She logically wished

to be aligned with someone other than the plaintiff who was isolated. The fact that Path Bath recanted her offer of help because Bernette Carway-Spruiell told her not to is yet another example of how LAS' management supported the Plaintiff's subordinates and not the Plaintiff. Messrs. Fox, Rosenberg, Ramos and James knew about this and did nothing.

117.    In December of 2014, the Plaintiff sent emails to Seymour James regarding the ADP services. The email included all relevant information and a suggestion was made that Senior Staff should be informed about the process as the service would help the entire Legal Aid Society and that anyone who is involved in hiring (Senior Staff) should hear the presentation. Seymour James sent an email on January 22, 2015 indicating that the information "should not be sent to Senior Staff." Seymour James initially refused to allow ADP to do a free presentation. Months later, Mr. James allowed the presentation to Senior Staff, but Senior Staff was not involved in the roll out and subsequent trainings. The most glaring omission was that the Pro Bono Practice, which recruits about three thousand (3,000) volunteers (attorneys and law students), was not involved in the training or deliberations in the initial stages. When asked about the hiring of paralegals, Aida Ramos said that "I just stuff the papers in the file drawers." The use of the ADP system would have the effect of transforming the process, not just in Legal Recruitment, but Society-wide (social workers, paralegals, investigators, grant writers, development staff, college interns, etc.). This recommendation was an indication that the Plaintiff was, yet again, trying to identify solutions to real issues in Recruitment, but was not supported.

118.    In December of 2014, Bernette Carway-Spruiell informs the Plaintiff that there will be a "transition" which suggested that she would be transferred away from Legal

Recruitment. The Plaintiff was never informed by Seymour James or Aida Ramos about any impending staff change or "transition." The Plaintiff had grown accustomed to staff being moved, so it was just perceived as something in due course. This was yet another example of Legal Aid management supporting a subordinate instead of clearly explaining to the subordinate that she was expected to comply with all reasonable, lawful and proper work-related requests at the risk of discipline from her supervisor. Legal Aid did not reprimand Bernette Carway-Spruiell because she was a surrogate of the leadership to continue and exacerbate the already hostile work environment.

119.     On or about December of 2014, a member of Senior Staff mentioned that Ms. Steckler had not been seen in 2 or 3 weeks and that a response was needed for a project. This was another example of someone in Senior Staff being AWOL. The Plaintiff was not reporting to Ms. Steckler at the time and the information was just conveyed during a casual conversation by a third party who had been trying to contact Ms. Steckler for work related purposes.

120.     On January 23, 2015, the Plaintiff sent an email to the Seymour James, Tamara Steckler, Adrienne Holder, Scott Rosenberg and Allan Fox regarding the need to update the LAS Employee handbook as a result of the Affordable Care Act. There was never any response. The updating of the Employee handbook should have been second nature to the CHRO, but it was not. In fact, Tamara Steckler seemed vicariously insulted for Mr. Fox and admonished the Plaintiff that "Allan knew how to do his job and didn't need any help. " In a more professional organization, the suggestion would have been well received because it was, objectively helpful, but at LAS the Plaintiff was insulted and ignored.

121.    In February of 2015, the Plaintiff told Bernette Carway-Spruiell that he felt as if he would "have a nervous breakdown" while he was in her office.  He also told Aida Ramos and she provide information regarding the Employee Assistance Program (EAP). This was the time when the level of stress, anxiety and depression started to be more acute.  The Plaintiff regularly calls EAP and continues to call EAP for support.

122.    From June of 2014 to November of 2014, the Plaintiff's mother, who had Alzheimer and dementia, called the Plaintiff and stated that she was at his office (LAS Headquarters- 199 Water Street) when she was not.  The plaintiff's mother would leave her apartment in various states of undress and amble throughout the neighborhood.  In fact, the Plaintiff even asked Aida Ramos (because Aida was in at 6am) whether security had contacted her that an elderly woman was in the lobby because the Plaintiff's mother was known to leave her apartment in various states of undress.  The Plaintiff's mother was initially placed in a nursing home in St. Albans, Queens and the Plaintiff visited everyday after work.  The convergence of the insults from the Leadership, yelling by Bernette Carway-Spruiell, efforts to sabotage, lack of cooperation and isolation started to affect the physical and mental health of the Plaintiff.  Legal Aid management knew of the Plaintiff's mother's mental condition, including when she started a fire in her apartment then wielded a machete towards NYPD and FDNY when they entered the apartment. LAS' leadership knew about the Plaintiff's mother's condition and continued to pressure the Plaintiff to resign via hostile work environment while he was attempting to manage the unpredictable episodes of a mother with Alzheimer's and dementia.  The Plaintiff had seen compassion and sympathy conveyed to other members of Senior Management.  In fact, when John Wroblewski mother passed away, it was the Plaintiff who purchased and

circulated the card.  Yet, when the Plaintiff's wife fell and sustained a 5 inch womb in her head rendering her unconscious and requiring hospitalization, there was no sympathy. No one ever asked "How's your wife?" Similarly when the Plaintiff's mother was having episode, there was no sympathy, just continued pressure by James, Ramos, Holder, Luongo, Steckler, Rosenberg and Fox. This behavior was outrageous.

123.    During a meeting with Seymour James, Mr. James told the Plaintiff that he "had heard" that the Plaintiff "came in late and left early." The Plaintiff was shocked and asked, "Who said this? Also, if this really were an issue, then why did you not ask me directly?" During the meeting the Plaintiff told Mr. James that he "once took groceries to his mother and came back to work and stayed late" to make up for the 40 minutes that it took.  Mr. James looked at the Plaintiff and yelled "Why can't you do that before work!" No other member of Senior Staff was subjected to such insults.  It is important to note that the Plaintiff was informed by HR that there are "people on disability who are receiving their full salaries." Also, the Plaintiff received information to suggest that there are people Society-wide who literally either do not come in or come in late and leave early.  Also, the Plaintiff has been logging the arrival and departure times of staff and on average staff get in as late as 10:45am and it is not made an issue.  The Plaintiff was never late to any meetings in 5 years and only missed 2 Senior Staff meetings, yet Seymour James felt the need to yell at the Plaintiff because he took groceries to his mother who lived 20 minutes away.  This was all done to create an environment such that any reasonable person, but the Plaintiff, in particular, would resign.

124.    In February of 2015, after regularly meeting alone with Ms. Carway-Spruiell, in her office, at the hospital and at dinner for 3 years without incident, Ms. Carway-Spruiell

47

sent an email to Aida Ramos indicating that she felt unsafe being alone with the Plaintiff and requested the 'presence of a third party at all times.' As the implication of this email was that the Plaintiff, after 3 years of an amicable relationship and treating s. Carway-Spruiell like family, had either threatened Ms. Carway-Spruiell, made some sexual advance or she was suddenly fearful of the Plaintiff. Ms. Ramos consequently attended all meetings. In March 2015 Ms. Carway-Spruiell followed the Plaintiff down the hall, as he was walking away, yelling "I'm not afraid of you! You're not afraid of Me! I'll walk behind you! I'll walk in front of you! I'll walk side by side with you!" As the Plaintiff walked away he was fearful of a physical confrontation. There were, at least, 6 ear and eye witnesses. LAS knew of the behavior and did nothing. In any other organization, such behavior would have resulted in, at least, a written warning. At Legal Aid, it was supported because it was directed toward the Black Plaintiff, who was never really welcomed or wanted by many at Legal Aid. In fact, the Plaintiff was once insulted by a woman in the Criminal Practice who, apparently, had been interested in the Recruitment job unbeknownst to the Plaintiff.

125.   On March 27, 2015, the Plaintiff sent an email to Bernette Carway-Spruiell asking for information and Aida Ramos was copied. Ms. Carway-Spruiell replied "I am not an enabler. I expect you to read every email." This was a request that it made everyday by managers around the country and at Legal Aid when someone cannot find an email. Ms. Carway-Spruiell refused to send it and Ms. Ramos (our "boss") said nothing regarding the insubordination. Mr. Fox, Rosenberg and James were aware of this behavior and did nothing. Ms. Ramos seemed to be afraid of Ms. Carway-Spruiell.

126.   In April or May, there was a "conference call" Scheduled for the impending Diversity Training. The day of the call, the Plaintiff dialed the call-in number and, while waiting for the call to begin, noticed that the chatter sounded as if he was the only person on the call and that everyone else was gathered in a conference room. The Plaintiff hung up the phone and walked to the conference room where he found everyone else in the room. The intention was to have the Plaintiff be physically isolated.

127.   On April 7, 2015, the Plaintiff met with Seymour James, Tamara Steckler, Adrienne Holder and Justine Luongo. The Plaintiff, as a result of the daily fear and dread, did not want to meet with any of the Legal Aid management, but he acquiesced because they were his superiors. This same courtesy was never afforded to the Plaintiff by his subordinates because LAS management was supporting their recalcitrant and insubordinate behavior.

128.   On April 7, 2015, the Plaintiff sent an email to Seymour James, Tamara Steckler, Adrienne Holder and Allan Fox regarding (Diversity Statement, Pipelines, Fellowship Posting, Placing the Process communication in Lasnet so that there is transparency and the Withdrawal analysis). Only Allan Fox responded. Being ignored by Legal aid management was how LAS management usually interacted with the Plaintiff. This willful lack of communication resulted in work not being done, the perception that work was not being done by the Plaintiff when the Plaintiff had no authority to make any decisions whatsoever. Ignoring the Plaintiff and isolating the Plaintiff were two of the strategies that were used to stoke the already hostile environment.

129.   On April 8, 2015, the Plaintiff sent an email to Human Resources (Allan Fox) requesting that HR send Recruitment the following information (the hires, transfer, etc.

for staff attorneys, interns, transfers, etc.). Tamara Steckler sent an email indicating that

the email "should only go to Allan" and asking "Why it was needed?" It was for work.

It was not an invitation to a social event. It should not be an issue when the Director of

Legal Recruitment asks for information about transfers, hires, etc., but it apparently was

for Ms. Steckler. This was either an indication that Ms. Steckler had no knowledge of

Legal Recruitment or Diversity work or she was willfully looking to harass, annoy and

treat the Black male Plaintiff like support staff or to put him in his place and not a Senior

Manager.

130.    On April 10, 2015, the Plaintiff requested information from Allan Fox (human

resources) regarding Foreign Hires, and I-9 Employment Verification. No information

was provided. Messers. Fox, James, Holder, Ramos, Holder, Luongo and Rosenberg all

knew about the request and no one responded. The Plaintiff was humiliated and insulted.

131.    On April 15, 2015, the Plaintiff sent the fourth prior request for the approval of

the Fellowship posting communication. The Practice at Legal Aid is that everything

pertaining to Recruitment must be approved by Seymour James, Tamara Steckler,

Adrienne Holder and Tina Luongo. Sometimes, Allan Fox and Scott Rosenberg and the

Union must review as well. After repeated requests and delays in the posting, the

Plaintiff finds out from a member of the Fellowship Committee that one of the Practices

will not be participating in the process, i.e. there will be no Fellowship applications

accepted from this practice area. The end result was that the Plaintiff had to explain to

the law Schools why there was a change after 4 years. The Plaintiff was not privy to the

reason and the posting was delayed. The Plaintiff was embarrassed because he was not

informed by LAS prior to the change and humiliated.  This was done intentionally to humiliate the Plaintiff as it relates to the law schools.

132.    On April 15, 2015 the Plaintiff requested the internal complaint information, in an effort to actually perform a function as a Director and specifically requested that it be received by June 1 (almost 2 months).  The email was sent to Seymour James, Tamara Steckler, Adrienne Holder, Justine Luongo and Allan Fox.  It was never provided.

133.    On April 16, 2015, the Plaintiff sent the usual request to have the Fellowship communication posted to Pat Bath (Communications Director).  This request had been made in exactly the same manner for the past 4 years.  Under the new direction of Seymour James, Pat Bath doesn't respond to the Plaintiff but sends it to Bernette Carway-Spruiell and to Aida Ramos.  Pat Bath, since Steve Banks' departure was now taking direction from Bernette Carway-Spruiell and ignoring the Plaintiff.

134.    On April 16, 2015, the Plaintiff asked Allan Fox and Scott Rosenberg whether Law Manager (a Legal Aid data base) is used to track hiring for the other areas other that Legal Recruitment.  Note that it was Scott Rosenberg who directed the Plaintiff/Director to put data into law manager.  Allan Fox responded that he did "not use" Law Manager so that he had "no idea."  This was an indication that only the Plaintiff was doing data entry work as a full time job and that all of members of Senior Staff were not using Law Manager or had staff whose role was to use Law Manager.  The fact that the Plaintiff was the only member of Senior Staff doing thousands of data entry was an indication of the willful, malicious and illegal disparate treatment of the Plaintiff as no other member of Senior Staff had entered 4 thousands entries into the Law Manager data base.

135.   On April 17, 2015, Bernette Carway-Spruiell removes the Plaintiff/Director from

the communications pertaining to the Recruitment of Interns and Aida Ramos is privy to

the omission via email.  For the prior 4 years, the practice, as agreed to by the Plaintiff

and Ms. Carway-Spruiell was to copy the Plaintiff/Director on all pertinent emails.   The

omission adversely impacted the efficiency of the process that had worked for 4 years

and prior to Seymour James becoming the Attorney-in-Chief.  This is just another

example of Ms. Carway-Spruiell attempting to sabotage the Plaintiff with the support of

Messrs. James, Luongo, Fox, Steckler, and Rosenberg.

136.   On April 17, 2015, New York Law School inquired about whether anyone from

the JRP Hiring Committee could talk about the hiring process.  Consequently, the

Plaintiff sent an email to Tamara Steckler and her response was "I am not comfortable

with this."  The law school was seeking an overview of how the process works in the

Juvenile Right s Practice.  There was no request for proprietary information or disclosure

of confidences.  It should also be noted that the Plaintiff/Director never knew who the

actual Committee members were in the JRP.  The Director did not know who was on the

Committee as all information was provided directly by Tamara Steckler.  It should also

be noted that the Plaintiff/Director had been excluded from the Criminal Defense Practice

Committee deliberations while Seymour James was the head of the Criminal Defense

practice and that practice was continued by Justine Luongo.  The Criminal Defense

represents the bulk of LAS' hiring and the fact that the Director of Legal Recruiting was

not involved and not privy to information is a bad practice and highly unusual.  It was

also embarrassing when the Director of Legal Recruitment would have to explain that he

had no knowledge about the CDP hiring and that he would have to inquire.

137.    In about 6 meetings from June of 2014 to April of 2015, Bernette Carway-Spriuiell was observed yelling at the Plaintiff in the presence of Senior Staff. On one occasion Aida Ramos forced the Plaintiff to meet with Bernette Carfway-Spruiell despite the fact that there was no need. At this meeting, Bernette Carway-Spruiell repeatedly yelled at the Plaintiff while Aida Ramos just sat there and observed. The Plaintiff said to Bernette Carway-Spruell, "I'm not sure why this bluster, ad hominem attacks and personal invective are necessary." Ms. Carway-Spruiell stood up, confidently strode across the office and said "Ha! He's trying to muzzle Bernette. Nobody muzzles Bernette." Aida Ramos did not say or do anything. After the meeting, the Plaintiff said to Ms. Ramos, "I asked you not to force me to do this. Why did you do this?" Ms. Ramos responded "I have to investigate." The Plaintiff replied, "Investigate what?" Then Ms. Ramos said "We looking at emails." This was one of the most humiliating moments of his life. The Plaintiff was extremely angry, but sat there and took the insults from Carway-Spuiell and the implied insults from Ms. Ramos. It is important to note that Bernette is regularly "muzzled" when dealing with those who condoned her behavior. In fact, she adopts a sweet saccharine tenor and is extremely deferential especially when the Senior staffer is white. When Ms. Steckler says stop or cease and desist, Carway-Spruiell stops, but she yells and screams at the Plaintiff because she had been assigned the task of antagonizing the Plaintiff, who she knew had conveyed that he believed that he would have a nervous breakdown.

138.    On April 17, 2015, the Plaintiff requests to leave two (2) hours early to visit his mother in a nursing home. Aida Ramos communicated that the Plaintiff will either be "charged a full day or half day (3 hours)." The Plaintiff is informed by staff that ADP

calculates time in increments so that there should have been "no issue." No other member of Senior Staff was charged a full or half day leave time when only two hours were needed. They would just leave and make up the time. In fact, Scott Rosenberg sent an email indicating that Senior Staff had: discretion" with regard to leave. This was clearly contradicted by what Ms. Ramos was enforcing against the Plaintiff. This is another example of the disparate treatment that the Plaintiff had to regularly endure.

139.    On April 17, 2015, the Plaintiff shares Aida Ramos' practice (docking the Plaintiff a half day or full day for 2 hours) with someone in Senior Management and the a Senior Staffer says "I take a couple hours all the time." "It looks like they are really trying to get you." This unsolicited statement was confirmation of what the Plaintiff already knew and was confirmed by a disinterested third party who observed the treatment, i.e. Messrs. James, Steckler, Ramos, Fox, Rosenberg, Steckler had targeted the Plaintiff, after Steve Banks' departure for isolation, derision, racism and to be the focal point of a campaign of hostile work environment.

140.    On April 15, 2015, the Plaintiff drafted and submitted an Onboarding Questionnaire that was to be used by new staff attorneys. The leadership delayed in responding (3 months) to the request for and never issued or used the Questionnaire as recommended. Another example of the Plaintiff being ignored. The Legal Recruitment & Diversity Manual was supposed to be a roadmap that was reviewed annually; it was never used as such and ignored. All viable, practical and sensible recommendations that would improve the quality of the Legal Aid brand as it relates to Recruitment & Diversity were willfully ignored, including a suggestion that LAS produce specific Legal Recruitment & Diversity materials, which is standard at the law firms. In addition, LAS

ignored the fact that the Plaintiff pointed out that all Practice areas were reflected in the Annual Report except Legal Recruitment & Diversity.  To date, Legal Recruitment & Diversity that participates in 27 On Campus Interview events, 14 Open Houses, 7 targeted Affinity Group projects, spearheaded the three year attainment of the 100% Rating on the Human Rights Corporate Equality Index, the Director is invited to present at the schools and none of it is in the Annual Report.  This was brought specifically to Seymour James' attention and nothing was done.

141.    On April 21, 2015, the Plaintiff inquires about whether The Legal Aid Society has a Survey Monkey account that Recruitment could use to survey law schools and also to analyze the Diversity responses that were submitted.  The Plaintiff also asked whether he could create a Recruitment Survey Monkey account.   The requested was questioned by Tamara Steckler and she suggested that it was a waste of time.  Survey Monkey is a tool that many professionals use in the workplace, including Diversity professional, yet the Plaintiff was not permitted to use it.  This was an insult to the Plaintiff and hypocritical of Ms. Steckler who is a proponent of unnecessary meetings that regularly waste time.  Ms. Steckler's job seems to consist of sending out laudatory emails to staff, communicating the existence of conferences and insulting and treating the Plaintiff like a child.  Survey Monkey is an efficient workplace tool that is used because it is efficient.  Allan Fox admitted to having a Survey Monkey account, but the Plaintiff was denied the opportunity to open a FREE Survey Monkey account.

142.    On April 23, 2015, the Plaintiff, after talking with ADP, is informed that ADP believes that the Plaintiff "is the head or the lead and" unilaterally "makes decisions" regarding the proposed ADP solution.  Despite the fact that the Plaintiff identified the

provider, identified the need, conducted the research and lead the effort, Seymour James named Allan Fox as the titular "lead" of the project. Someone at Legal Aid intentionally and knowingly misrepresented the Plaintiff's position to ADP. This misrepresentation resulted in ADP believing that the Plaintiff had authority that he did not have. The Plaintiff had no authority and his suggestions were regularly ignored. This shows a degree of duplicity that is unmatched and unexpected for a law firm.

143.    On April 24, 2015, the Plaintiff requests Exit Interview information from Justine Luongo, Adrienne Holder and Tamara Steckler. Ms. Luongo referred the Plaintiff to Aida Ramos. Aida Ramos referred the Plaintiff to Justine Luongo. There was no response from the others. The information was never provided. Exit Interviews often provide insight why employees leave organizations or request transfers; therefore, it is an important tool in Diversity and Legal Recruitment work. The information was never provided. There was even a suggestion that it may not even been done by HR. If LAS has no record of Exit Interviews, then that is an indictment on the Society as a general matter, but this falls directly in the purview of the Chief Human Resources Officer.

144.    On April 27, 2015, Bernette Carway-Spruiell, in an attempt to sabotage and undermine the Plaintiff changes what had been a standard practice regarding interns. This was known by LAS management and supported.

145.    In April or May 2015, the Plaintiff is demoted from a Director and member of Senior Staff who is part of the Administration to being assigned to the Juvenile Rights Practice. The move, for all intents, purposes, consequences and repercussions was a demotion and assigned to Tamara Steckler. At the Plaintiff's first meeting with Ms. Steckler, Ms. Steckler said "you have to prove yourself." She said this after the Plaintiff